A-570-831
Remand
Slip Op. 26-51
**Public Version**
E&C/OVII: CD

***Green Garden Produce, LLC v. United States,***
**Court No. 24-00114, Slip Op. 26-00051 (CIT May 15, 2026)**
**Fresh Garlic from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND**

## I. SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the opinion and remand order of the U.S. Court of International Trade (the Court) in *Green Garden Produce, LLC v. United States*, Court No. 24-00114, Slip Op. 26-51 (CIT May 15, 2026).[1] This action arises out of the circumvention inquiry of the antidumping duty (AD) order on fresh garlic from the People's Republic of China (China).[2]

In the *Remand Order*, the Court remanded Commerce's determination that the inquiry merchandise (*i.e.*, large and small garlic chunks produced in China) is not expressly excluded from the scope of the *Order*[3] as "preserved by the addition of other ingredients," the other ingredient here being citric acid.[4] In particular, the Court has ordered Commerce to: (1) consider whether evidence presented in Green Garden Produce, LLC (Green Garden)'s original scope application shows that Chinese producers generally use citric acid to preserve large and

[1] *See Green Garden Produce, LLC v. United States*, Court No. 24-00114, Slip Op. 26-51 (CIT May 15, 2026) (*Remand Order*).
[2] *See Fresh Garlic from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 89 FR 50256 (June 13, 2024) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Antidumping Duty Order: Fresh Garlic from the People's Republic of China*, 59 FR 59209 (November 16, 1994) (*Order*).
[4] *See Remand Order* at 15-19.

small garlic chunks and (2) consider whether Green Garden's large and small garlic chunks specifically are excluded from the scope of the *Order* because they are preserved with citric acid.[5] Furthermore, the Court partially remanded Commerce's minor alterations analysis.[6] Specifically, the Court remanded Commerce's analyses regarding: (1) the expectations of ultimate users and use of merchandise; (2) the channels of marketing and distribution; and (3) the cost of modification relative to total value.[7]

## II. BACKGROUND

On February 16, 2023, pursuant to section 781(b) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.226(c), the Fresh Garlic Producers Association and its individual members (collectively, the petitioners) filed a circumvention inquiry request alleging that individually quick frozen (IQF) garlic products that have been reduced in size beyond the clove are circumventing the *Order* and, accordingly, should be included within the scope of the *Order*.[8] On June 8, 2023, Commerce published in the *Federal Register* the notice of initiation of this circumvention inquiry.[9] In the *Initiation Notice*, Commerce initiated the circumvention inquiry on the basis of the minor alterations allegation, pursuant to section 781(c) of the Act and 19 CFR 351.226(j).[10] Commerce also initiated the inquiry on a country-wide basis.[11] On November 14, 2023, Commerce preliminarily determined that entries of small and large garlic chunks are circumventing the *Order* because small and large garlic chunks are "{an} article altered in form or appearance in minor respects," within the meaning of section 781(c) of the Act

---

[5] *Id.* at 15-24.
[6] *Id.* at 19-24.
[7] *Id.* at 20-24.
[8] *See* Petitioners' Letter, "Petitioners' Request for Circumvention Ruling Pursuant to Section 781(c) of the Tariff Act of 1930, As Amended," dated February 16, 2023 (Petitioners' Circumvention Request).
[9] *See Fresh Garlic from the People's Republic of China: Initiation of Circumvention Inquiry on the Antidumping Duty Order*, 88 FR 37510 (June 8, 2023) (*Initiation Notice*), and accompanying Initiation Checklist.
[10] *Id.*
[11] *Id.*

and 19 CFR 351.226(j).[12] On June 13, 2024, Commerce issued its *Final Determination* continuing to find that small and large garlic chunks produced in China and exported to the United States constitute merchandise altered in form or appearance in such minor respects that they should be included within the scope of the *Order* on fresh garlic from China.[13] On August 25, 2026, Commerce released and provided interested parties with an opportunity to comment on the Draft Remand.[14] On September 1, 2026, Green Garden and the petitioners filed comments on the Draft Remand.[15] Commerce responds to the comments below.

## III. ANALYSIS

### 1. Whether large and small garlic chunks imported by Green Garden are excluded from the *Order* via the addition of citric acid

Commerce finds that the record demonstrates that large and small garlic chunks are not expressly excluded from scope of the *Order* by the addition of citric acid. In the *Remand Order*, the Court found that Commerce failed to address Green Garden's argument that the large and small garlic chunks it imported are expressly excluded from the *Order* due to the addition of citric acid, a question the Court found Commerce was obligated to answer.[16] On remand, the Court directed Commerce to "entertain the theory … that the order expressly excludes the importer's garlic chunks because they are preserved with citric acid."[17] Because Commerce has previously conducted a scope ruling of the inquiry merchandise, *see Remand Order* at 7-8, and

[12] *See Fresh Garlic from the People's Republic of China: Preliminary Affirmative Determination of Circumvention*, 88 FR 77959 (November 14, 2023) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).
[13] *See Final Determination*.
[14] *See Draft Results of Redetermination Pursuant to Court Remand, Green Garden Produce, LLC v. United States*, Court No. 24-00114, Slip Op. 26-00051 (CIT May 15, 2026) (Draft Remand).
[15] *See* Green Garden's Letter, "Green Garden Produce LLC's Comments to Draft Results of Redetermination Pursuant to Court Remand," dated September 1, 2026 (Green Garden's Draft Remand Comments); *see also* Petitioners' Letter, "Petitioners' Comments on Draft Results of Redetermination Pursuant to Court Remand," dated September 1, 2026 (Petitioners' Draft Remand Comments).
[16] *See Remand Order* at 15-19.
[17] *Id.* at 18. Alternatively, the Court said, Commerce could "provide a reasonable justification for declining to do so." As we explain, we have opted to analyze the scope exclusion question.

because the Court has directed Commerce to address Green Garden's particular argument with respect to the addition of citric acid, Commerce does not here undertake a full scope ruling. However, Commerce does find that its scope ruling regulation at 19 CFR 351.225 is informative, and thus have utilized the hierarchy of interpretive sources laid out in 19 CFR 351.225(k) to guide Commerce's analysis of the scope exclusion question.

Record evidence illustrates that the inquiry merchandise undergoes blanching as part of the IQF process, which Commerce has in a prior scope ruling found to not meet the scope exclusion for preserved by heat processing.[18] In the Trinity IQF Garlic Cloves Scope Ruling, Commerce found that the blanching step within the IQF process "does not constitute heat processing, in that the garlic is essentially the same product before and following the blanching process."[19] Though citric acid is added in the blanching and cooling processes per Green Garden,[20] record evidence does not suggest that the citric acid plays a role distinct from the blanching process, *i.e.*, does not alter the garlic in some other way.[21] Said differently, record evidence does not demonstrate that the garlic is *additionally* preserved by the addition of citric acid beyond any what occurs when the garlic is blanched. On this basis, Commerce finds that the incorporation of citric acid in the blanching and cooling of the garlic does not constitute preservation by the addition of an ingredient, *i.e.*, citric acid.

Green Garden argues that the inquiry merchandise is distinct from the merchandise considered in the Trinity IQF Garlic Cloves Scope Ruling because Trinity's garlic cloves were chilled in two percent kosher salt water before the IQF process, whereas the inquiry merchandise

---

[18] *See* Memorandum, "Scope Ruling – Trinity IQF Garlic Cloves," dated July 21, 2021 (Trinity IQF Garlic Cloves Scope Ruling).
[19] *Id.*at 8.
[20] *See* Green Garden's Letter, "Green Garden Produce LLC's Comments to Fresh Garlic Producers Association's Request for Circumvention Inquiry," dated July 10, 2023 (Green Garden's Comments), at 5-6.
[21] *Id*. at 7-10.

here was cooled in a citric acid aqua solution for five minutes before undergoing the IQF process.[22] In addition, Green Garden states that citric acid serves as a more effective preservation than kosher salt.[23] Green Garden's argument improperly focuses on the effectiveness of the additional ingredient where the relevant inquiry is whether the additional ingredient preserves the inquiry merchandise beyond the preservation resulting from the IQF process. In the Trinity IQF Garlic Cloves Scope Ruling, Commerce determined that "blanched" garlic does not fall within the "heat processing" exclusion and found Trinity's inquiry merchandise within the scope of the *Order*.[24] The salt in the blanching solution could also be used as a preservative, as confirmed by the U.S. Food and Drug Administration (FDA) publication provided by Green Garden;[25] but as discussed below, it is similar to the citric acid in Green Garden's blanching solution because it does not preserve the garlic or coat the garlic before being frozen with the garlic. Accordingly, Commerce considers the IQF process the preservation technique and blanching is simply a step in the IQF process and does not separately preserve the garlic via the addition of other ingredients or heat processing. Record evidence thus supports finding that the minute addition of citric acid in the IQF process applied to the inquiry merchandise does not, on its own, constitute preservation by the addition of an ingredient.

Furthermore, Green Garden's remaining claims and supporting documentation are unpersuasive in finding that the inquiry merchandise is preserved by the addition of citric acid. Specifically, Green Garden provides a FDA publication as support that citric acid is considered a preservative.[26] Green Garden is correct that the publication lists citric acid as a preservative, but

---

[22] *See* Green Garden's Letter, "Green Garden Produce, LLC's Comments on Commerce's Preliminary Affirmative Determination of the Circumvention for Small and Large Garlic Chunks," dated December 5, 2023, at 6; *see also* Green Garden's Comments at Exhibit 1 (citing Trinity IQF Garlic Cloves Scope Ruling at 3)).
[23] *See* Green Garden Comments at 10.
[24] *See* Trinity IQF Garlic Cloves Scope Ruling at 8.
[25] *See* Green Garden's Comments at Exhibit 1 (citing Green Garden's Scope Ruling Application at Exhibit 9).
[26] *Id*. at 8 (citing Green Garden's Scope Ruling Application at Exhibit 9).

it also mentions citric acid as a pH control agent and acidulant.[27] Accordingly, the publication indicates that citric acid is not only used for preservation but also for other purposes depending on how it is used in certain applications (*i.e.*, controlling acidity and alkalinity).[28] Most importantly, there is no information in the publication that supports its claim that the inquiry merchandise is preserved using citric acid, nor any information that a citric acid aqua solution used for blanching is considered preservation using citric acid. Green Garden also provides a scholarly article from Waseda University about citric acid as support that citric acid preserves the inquiry merchandise.[29] However, this article only supports the argument that one of the applications of citric acid may be as a preservative, not that a citric acid aqua solution used for blanching, which contains a small amount of citric acid, is considered preservation through citric acid.

Green Garden states that the blanching process does not include the process of cooling in citric acid and that cooling the garlic in a citric acid solution is an additional step to aid in preservation.[30] However, to the extent that Green Garden only imports from Fenjun Foodstuff Co., Ltd. (Fenjun) and Qingdao Deesheng Hengxin Food Co., Ltd. (Hengxin), which record evidence illustrates it does not, Fenjun and Hengxin's response contradicts this claim.[31] Specifically, Fenjun and Hengxin provided flowcharts of the production process, which list blanching and cooling as a singular process.[32] Thus, the information Commerce has on the record from producers of inquiry merchandise illustrates that the citric acid present in the

---

[27] *Id*. at Exhibit 1 (citing Green Garden's Scope Ruling Application at Exhibit 9).
[28] *Id*.
[29] *Id*. at 8 (citing Green Garden's Scope Ruling Application at Exhibit 9).
[30] *Id*.
[31] *See* Fenjun's Letter, "Fenjun Foodstuff Co., Ltd.'s Response to Circumvention Inquiry Initial Questionnaire," dated August 23, 2023 (Fenjun's QR), at Exhibit 4; *see also* Hengxin's Letter, "Qingdao Deesheng Hengxin Food Co., Ltd.'s Response to Circumvention Inquiry Initial Questionnaire," dated August 23, 2023 (Hengxin's QR), at Exhibit 4.
[32] *Id*.

production process is simply part of the blanching process, which is covered by the scope of the *Order*, and does not constitute a separate and distinct process.

Finally, Green Garden states that the inquiry garlic is coated in a citric acid aqua solution and then frozen, thus illustrating that the process is analogous to that described in Customs Ruling N262027.[33] Irrespective of the merits of this argument, according to 19 CFR 351.225(k)(ii), customs rulings are classified as secondary interpretive sources. Moreover, to the extent that these secondary interpretive sources conflict with primary interpretive sources under 19 CFR 351.225(k)(1)(i), the primary interpretive sources will normally control. In this case, prior scope rulings make it clear that the IQF process preserves the garlic not the citric acid. As a result, Commerce need not consider this secondary interpretive source. However, even assuming, *arguendo*, Customs Ruling N262027 was informative, it suffers from two glaring flaws: first, it pertains to the classification of a different product under the Harmonized Tariff System of the United States (HTSUS)—whereas here Commerce is considering whether the inquiry merchandise is within the scope of the order—and second, the customs ruling provides no explanation for its determination.[34] Moreover, the product described in Customs Ruling N262027 was coated "evenly and completely" with citric acid, whereas the inquiry merchandise is boiled and then cooled in citric acid aqua solutions (similar to the salt added to the water mentioned above). Furthermore, to the extent that Green Garden speaks on behalf of producers of inquiry merchandise, Fenjun and Hengxin's ([ ])[35] responses do not mention citric acid being used to coat the inquiry merchandise; only that citric acid is used in the aqua based solution during the blanching and

[33] *See* Green Garden's Comments at 5, 9.
[34] *See* Green Garden's Comments at Exhibit 1 (citing Green Garden's Scope Ruling Application at Exhibit 1).
[35] *Id*.

cooling process. Accordingly, there is no evidence on the record supporting Green Garden's claim that the inquiry merchandise is coated in citric acid. Accordingly, for the reasons detailed above, Commerce finds that the record demonstrates that large and small garlic chunks are not expressly excluded from scope of the *Order* by the addition of citric acid.

**2. Whether evidence placed on the record by Green Garden supports finding that all large and small garlic chunks produced in China are excluded from the *Order* via the use of citric acid**

As Commerce finds that the inquiry merchandise produced and/or exported by Fenjun and Hengxin is not expressly excluded from the scope of the *Order* by the addition of citric acid, as explained above, Commerce need not determine whether Chinese producers of inquiry merchandise more generally are excluded from the scope of the *Order*. In addition to its directive to analyze Green Garden's argument that its imports are excluded from the scope of the *Order* via the addition of citric acid (or provide justification for not doing so), the Court further directed Commerce to address Green Garden's argument "that its evidence shows that producers of inquiry merchandise {more generally} use citric acid as a preservative and therefore such goods are excluded."[36]

For the reasons described above, just as the record supports finding that Green Garden's small and large garlic chunks are not expressly excluded from the scope of the *Order*, record evidence likewise supports finding that small and large garlic chunks produced/exported from China more generally are likewise not expressly excluded from the scope of the *Order*. Green Garden's arguments in support of finding the inquiry merchandise excluded from the scope of the *Order* go unsupported in the record, and are even contradicted by record evidence (*e.g.*, record evidence submitted by Fenjun and Hengxin contradicts Green Garden's claim that citric

[36] *See Remand Order* at 19.

acid is applied as a distinct step within the IQF process, showing instead that the citric acid added to the blanching and cooling process is not a distinct and separate step).

Commerce furthers note that because [ ] and that the record does not enlighten whether Green Garden's suppliers also supply to other U.S. importers, Commerce is unable to discern from the record whether Green Garden's arguments are applicable to all producers/exporters of inquiry merchandise from China.[37] In addition, the fact that Green Garden's arguments were all framed as asserting that "Green Garden's inquiry garlic"[38] should be excluded from the scope of the *Order* is further evidence that Commerce cannot affirmatively take Green Garden's arguments as representative of inquiry garlic beyond what Green Garden imports. To the extent that Green Garden's arguments may be representative of producers/exporters of the inquiry merchandise more generally, as Commerce has determined that the inquiry merchandise is not expressly excluded from the scope of the *Order*, Commerce need not determine whether producers of inquiry merchandise more generally are excluded from the scope of the *Order*.

**3. Circumvention inquiry analysis**

*a. Expectations of Ultimate Users and Use of Merchandise*

Commerce continues to find that the merchandise is minorly altered because expectations of the ultimate users and use of the inquiry merchandise are the same as in-scope fresh garlic. In the *Remand Order*, the Court held that Commerce did not consider certain supporting documentation presented by Green Garden relating to the expectations of ultimate users and use

[37] *See* Green Garden's Comments at Exhibit 1 (citing Green Garden's Scope Ruling Application at Exhibit 1).
[38] *See, e.g.*, Green Garden's Comments at 5 ("Green Garden's Small Garlic Chunks are described as…") and 9 ("Green Garden's use of citric aqua solution to blanch the garlic chunks should not remove the garlic chunks from the scope of the Order.").

of merchandise.[39] Accordingly, on remand, Commerce has reconsidered the supporting documentation submitted by Green Garden.[40] Green Garden principally argues that purchasers of garlic chunks have different expectations than do purchasers of garlic whole or separated into constituent cloves because purchasers of the latter expect "aesthetically pleasing" garlic, whereas visual aesthetic qualities are immaterial to purchasers of garlic chunks.[41] Green Garden cites the U.S. International Trade Commission (ITC) Final Staff Report in the investigation as support that the expectations of the ultimate users and use of merchandise differ between the inquiry merchandise and in-scope fresh garlic.[42] Specifically, Green Garden points out that the ITC states that in-scope garlic must be aesthetically pleasing and that ultimate purchasers, *i.e.*, supermarkets and grocery stores, expect the garlic to look like fresh garlic in color, size, and shape.[43] But Green Garden omits the ITC's discussion of fresh garlic as being used for further processing. Though the ITC notes that fresh garlic sold to processors at the time of the investigation was primarily for "product unsuitable for the fresh market," notably, the ITC recognized that fresh garlic is sold to food processors.[44] Accordingly, though the expectations of end users may vary depending on whether the end user is in the fresh use market or a food processor, it still remains true that a food processor purchasing fresh garlic (whole or in constituent cloves) has the same expectations as a purchaser of garlic chunks, *i.e.*, to be further processed.[45]

---

[39] *Id*. at 20-22.
[40] *Id*. at 22.
[41] *See* Green Garden's Comments at 16-17.
[42] *See* Green Garden's Comments at 17 (citing Exhibit 11 (*Fresh Garlic from China*, Inv. No. 731-TA-683 (Final) USITC Pub. 2825 (November 1994) (ITC Final Staff Report))).
[43] *See* ITC Final Staff Report.
[44] *Id.* at II-17.
[45] *Id.*

Moreover, with respect to garlic chunks destined for the fresh use market, the ITC states that fresh garlic may also be used in chopped or pureed form.[46] Specifically, the ITC states that chopped fresh garlic is often displayed alongside fresh garlic as an alternative to using unprocessed fresh garlic bulbs.[47] Processed fresh garlic is generally offered as a way for consumers to reduce their food preparation time.[48] Consequently, the ITC considers chopped garlic, which is what the inquiry merchandise is considered, as in-scope fresh garlic and aesthetically pleasing. The ITC also states that 15-20 percent of fresh garlic was sold or used for further processing just like garlic chunks at the time of the investigation.[49]

Furthermore, Green Garden states that fresh garlic is used in fresh food preparations, while the inquiry merchandise is used in making minced garlic, garlic puree, and roasted garlic powder which will be subsequently incorporated into prepared foods.[50] Green Garden emphasizes that the inquiry merchandise cannot be used in fresh food preparations since it is a lower grade of garlic and smaller in size.[51] Although Green Garden states that the inquiry merchandise cannot be used in fresh food preparations, the producers of the inquiry merchandise, Fenjun and Hengxin, state that it is used in dips, mashes, and salads which are fresh food preparations.[52] Furthermore, Green Garden did not provide any evidence that the inquiry merchandise is not used in fresh food preparations. Accordingly, after re-analyzing the arguments and supporting documentation presented by Green Garden, Commerce continues to find that the expectations of the ultimate users and use of merchandise for the inquiry

[46] *Id*. at II-7.
[47] *Id*. at FN25.
[48] *Id*.
[49] *Id*. at I-41.
[50] *See* Green Garden's Comments at 17.
[51] *See* Green Garden's Preliminary Determination Comments at 8-9.
[52] *See* Fenjun's QR at 18; *see also* Hengxin's QR at 18.

merchandise are the same as in-scope fresh garlic and supports a finding that the inquiry merchandise is minorly altered.

*b. Channels of Marketing and Distribution*

In the *Remand Order*, the Court directed Commerce to reconsider the evidence Green Garden presented relating to the channels of marketing and distribution.[53] Commerce has done so here, and continue to find that the channels of marketing and distribution between in-scope merchandise and small and large garlic chunks are the same.

Green Garden claims that neither Fenjun nor Hengxin market diced garlic.[54] But the fact that Fenjun and Hengxin state that they do not market garlic cloves or diced garlic[55] does not detract from the evidence on the record demonstrating that IQF garlic chunks are marketed in the same manner as in-scope merchandise.[56] Moreover, the company brochures provided by both Fenjun and Hengxin clearly include garlic, generally, and garlic cloves.[57] Commerce thus continues to find the record evidence to support finding similar channels of marketing.

Green Garden also claims that the petitioner's marketing materials provided in its circumvention request incorrectly compare the inquiry merchandise to IQF garlic cloves.[58] However, the marketing materials provided by the petitioners demonstrate that IQF garlic cloves, fresh garlic cloves, and inquiry merchandise are all marketed identically.[59] For example, Kiril Mischeff markets IQF garlic as both whole cloves and "nugget" (*i.e.*, chunks) form, noting that, regardless of the form, the products retain fresh flavor and can be used as a substitute for fresh

[53] *See Remand Order* at 22.
[54] *See* Green Garden's Preliminary Determination Comments at 9.
[55] *See* Fenjun's QR at 30-31; *see also* Hengxin's QR at 30.
[56] *See* Petitioners' Circumvention Request at Exhibit 10 ("Our IQF garlic is available in whole cloves, nuggets, diced into 4mm pieces or as a frozen purée – all retaining fabulous fresh flavour and natural goodness.").
[57] *See* Fenjun's QR at Exhibit 3; *see also* Hengxin's QR at Exhibit 2.
[58] *See* Green Garden's Preliminary Determination Comments at 9.
[59] *See* Petitioners' Circumvention Request at Exhibit 10.

garlic or as an ingredient for sauces, dips and dressings.[60] In addition, they state that IQF garlic is just like fresh garlic once defrosted.[61]

Finally, Green Garden states that the ITC makes it clear that in-scope garlic is mostly sold to wholesalers/distributors, who in turn sell to supermarkets, grocery stores, and restaurants.[62] However, as mentioned above, Green Garden fails to acknowledge that the ITC also states that smaller quantities of fresh garlic were sold by producers and importers in the non-fresh use market to food processors at the time of the investigation.[63] Green Garden states that its customers are food manufacturers who process garlic chunks into roasted garlic powder,[64] similar to the end users of dehydrated garlic, which the ITC characterizes as "used principally in the preparation of other prepared foods, including frozen and canned food products, plus dry soups and seasoning mixes."[65] The ITC identifies fresh and dehydrated garlic as substitutes for one another "in many food preparations," and notes that during the period examined, garlic from China was used in both fresh and dehydrated markets.[66] With respect to channels of distribution, the ITC found the existence of a channel of distribution of fresh garlic to food processors, including dehydrators.[67] Record evidence thus suggests several channels of distribution of fresh garlic, depending on the end use, including to food processors. Accordingly, after further analysis of the arguments and supporting documentation presented by Green Garden, Commerce continues to find that the channels of marketing and distribution for the inquiry merchandise are

[60] *Id*.
[61] *Id*.
[62] *See* Green Garden's Comments at 18 (citing ITC Final Staff Report at II-17).
[63] *Id*.
[64] *Id*.
[65] ITC Final Staff Report at II-7-II-8.
[66] *Id.* at II-8.
[67] *Id.* at II-17-II-18.

the same as in-scope fresh garlic (sold to food processors) and supports a finding that the inquiry merchandise is minorly altered.

*c. Cost of Modification Relative to Total Value*

Commerce continues to find that the inquiry merchandise is minorly altered because respondents did not provide supporting information related to the cost of modification and that, even if such supporting information had been provided, what Commerce does have on the record supports finding that dicing provides insignificant added value to the merchandise. In the *Remand Order*, the Court held that Commerce improperly considered the use of lower grade garlic as a modification when analyzing the total cost of modification relative to total value.[68] Thus, on remand, Commerce hasreconsidered the cost of modification relative to total value for only the dicing.[69] Green Garden states, without supporting evidence, that the cost of modification is 13 percent higher to produce large IQF garlic chunks and 17 percent higher to produce small IQF garlic chunks as compared to a standard clove.[70] In addition, Green Garden references Fenjun and Hengxin's reporting, stating that the cost of modification from garlic clove to garlic chunks, grade of garlic being consistent, is 20 to 21.3 percent higher, which results in a significant cost of modification and supports the finding that the garlic chunks are not minorly altered.[71] However, neither Green Garden nor Fenjun and Hengxin provide the required support regarding the cost of modification. In Green Garden's comments, there is no reference to supporting documentation to support its claim.[72] With respect to Fenjun and Hengxin's reporting, in the initial questionnaire, Commerce specifically requested fully translated

[68] *See Remand Order* at 23-24.
[69] *Id*. at 24.
[70] *See* Green Garden Comments at 19.
[71] *See* Green Garden's Preliminary Determination Comments at 10 (citing Fenjun's QR at 29 and Hengxin's QR at 28).
[72] *See* Green Garden Comments at 19.

documentation supporting the response (*i.e.*, internal price lists), which neither respondent provided.[73] In a supplemental questionnaire, Commerce asked the respondents to provide all available documentation related to the difference in cost incurred in producing the subject and inquiry merchandise.[74] However, the support Fenjun provided does not support the differences in cost and is in fact contradictory of its claim that the sales price of diced garlic is 21.3 percent higher than the sales price of garlic cloves, if using the same grade of garlic.[75] Specifically, Fenjun provides a purchase order of [ ] garlic cubes and diced garlic.[76] [ ][77] [ ],[78] [ ]. By Green Garden's own account, smaller chunks are more expensive to produce than the large chunks which require less processing.[79] Furthermore, Fenjun provided a purchase order for another order of diced garlic and a purchase order for garlic cloves.[80] However, [ ].[81] Hengxin did not appropriately respond to the question in the supplemental and instead untimely requested an extension in response to the question.[82] Thus, the evidence Commerce does have on the record suggests that

[73] *See* Commerce's Letter, "Circumvention Inquiry Initial Questionnaire," dated July 19, 2023 at 5.
[74] *See* Commerce's Letter, "Supplemental Questionnaire for Fenjun Foodstuff Co., Ltd.," dated September 14, 2023 (Fenjun's SQR), at 2.
[75] *Id*. at Exhibits 2-5. Fenjun uses B grade garlic to produce garlic chunks/diced garlic, and sells A grade garlic as garlic cloves. *See* Fenjun's SQR at 8.
[76] *Id*.
[77] *Id*. at Exhibit 2. [ ].
[78] *Id*. at Exhibit 3. [ ].
[79] *See* Green Garden Comments at 19.
[80] *Id*. at Exhibits 4-5.
[81] *Id*. at 8.
[82] *See* Hengxin's Letter, "Qingdao Deeshenghengxin Food Co., Ltd.'s Responses to Supplemental Questionnaire," dated September 29, 2023, at 6.

Green Garden's information is unreliable in evaluating the cost of modification of diced garlic relative to the standard clove, and Green Garden's claim remains unsupported. In sum, Green Garden failed to provide necessary supporting documentation to support its claim, and the documentation that was submitted to the record either undermines Green Garden's claim or cannot be relied upon [ ].

Even were Commerce to accept Fenjun and Hengxin's reporting—and Green Garden's arguments—in this respect, Commerce does not find the purported value-added range of 13 to 21.3 percent to be substantial.[83] Although Commerce finds the purchase orders submitted by Fenjun do not support its claimed modification costs, as discussed above, taking the listed prices for garlic cubes and diced garlic in this documentation as accurate, they suggest that the overall cost of producing these products is low.[84] Consequently, the claimed value-added range of 13 to 21.3 percent, when applied to such low-cost products and the nature of processing for this particular product, would not be significant in absolute terms. Accordingly, after further analysis of the arguments and supporting documentation, Commerce continues to find that the dicing provides insignificant added value to the merchandise and that this supports a finding that the inquiry merchandise is minorly altered.

## IV. INTERESTED PARTY COMMENTS

*Green Garden's Comments*

The following is a verbatim summary of argument submitted by Green Garden. For further detail, *see* Green Garden's Draft Remand Comments at 4-18.

> Commerce should find that Green Garden's garlic chunks are excluded from the *Order* or, alternatively, do not constitute merchandise altered in minor respects. First, Commerce has not answered the question directed by the Court: whether the

[83] *See, e.g.*, *Canadian Solar International Limited v. United States*, 788 F. Supp. 3d 1262, 1274 (CIT 2025) (upholding Commerce's finding that a value added within the range of 26 to 34 percent of U.S. import value was a small proportion of the total value).
[84] *See* Fenjun's SQR at Exhibits 2-3.

*Order* expressly excludes Green Garden's garlic chunks because they are preserved with citric acid. Instead, Commerce asks whether citric acid preserves the merchandise "beyond" preservation resulting from the IQF process and whether citric acid independently or separately preserves the garlic. Those requirements do not appear in the *Order*, which excludes garlic "preserved by the addition of other ingredients." Nothing in the scope language requires an added ingredient to be the exclusive, principal, independent, or incremental means of preservation.

Commerce also improperly relies upon the Trinity scope ruling. Trinity addressed whether blanching constitutes excluded "heat processing"; it did not determine whether an ingredient introduced during blanching may preserve garlic within the separate exclusion for preservation "by the addition of other ingredients." Commerce therefore cannot reasonably extend Trinity into a categorical rule that citric acid added during blanching or cooling cannot preserve garlic. Moreover, Commerce acknowledges evidence identifying citric acid as a preservative but discounts that evidence because citric acid may have other purposes. That reasoning improperly shifts the inquiry from citric acid's objective preservative effect to its intended purpose. Record evidence further demonstrates that the 0.3-percent citric-acid solution used by the mandatory respondents is sufficiently concentrated to inhibit bacterial growth. Commerce should address that evidence directly.

Second, Commerce's reconsideration of the minor-alterations factors does not cure the deficiencies identified by the Court. Regarding expectations and uses and channels of distribution, Commerce establishes only partial overlap. Evidence that some food processors purchase both garlic chunks and in-scope garlic does not establish that expectations and uses are "the same," particularly where Commerce acknowledges that only 15–20 percent of fresh garlic is sold or used for further processing. Similarly, one overlapping food-processor distribution channel does not establish identical channels where Commerce acknowledges that fresh garlic is predominantly distributed through wholesalers to supermarkets, grocery stores, and restaurants.

Finally, Commerce's cost-of-modification analysis applies the wrong inquiry. The regulation requires consideration of modification cost "relative to the total value," yet Commerce discounts a 13–21.3 percent relative increase because garlic is inexpensive "in absolute terms." The low value of the underlying garlic is already incorporated into the relative-value comparison and cannot reasonably serve as a separate basis for disregarding that comparison. Commerce also newly characterizes respondents' cost information as unreliable without adequately explaining its changed treatment of evidence previously relied upon. If Commerce now considers respondents' submissions deficient, it should provide the notice and opportunity to remedy or explain those deficiencies required by 19 U.S.C. § 1677m(d).

*Petitioners' Comments*

The following is a verbatim summary of argument submitted by the petitioners. For further details, *see* Petitioners' Draft Remand Comments at 4-10.[85]

> First, {Commerce} is correct in finding that {Green Garden} small and large {IQF} garlic chunks are not specifically excluded from the scope of the *Order*. {Commerce's} additional analysis, findings, and explanation provided in its Draft Remand Results comply with {the Court's} narrowly tailored instruction to consider Green Garden's argument that its garlic chunks are expressly excluded from the *Order's* scope based on Green Garden's claim that they are preserved by the addition of citric acid. {Commerce's} regulations permit but do not require the agency to consider Green Garden's scope arguments in its circumvention inquiry,[86] and therefore {Commerce} correctly notes that it need not undertake a full scope inquiry analysis, especially given that it previously conducted a full scope inquiry of the inquiry merchandise.[87] Even if {Commerce} were to consider additional arguments made by Green Garden in support of its claim that its IQF garlic chunks are expressly excluded from the scope, those arguments fail. For example, contrary to Green Garden's claim that its IQF garlic chunks are excluded because they are "downstream" garlic products that are "further processed,"[88] the *Order's* scope contains no such express exclusion and Green Garden's products are similar to other in-scope products such as Trinity's IQF garlic cloves.[89] In addition, Green Garden's argument[90] that the tariff classification of its garlic chunks distinguishes its merchandise from in-scope products also fails because the tariff classification is not determinative in {Commerce's} circumvention analysis and {Commerce} previously found Trinity's IQF garlic cloves to be covered by the Order's scope – merchandise classified under the same HTSUS category as Green Garden's products.[91]
>
> Second, {Commerce} is also correct in finding that the inquiry merchandise is not expressly excluded from the *Order's* scope by being preserved using the addition of citric acid, and that record evidence, such as information concerning expectations of the ultimate users and the use of the merchandise, channels of marketing and distribution, and cost of modifying the merchandise relative to its total value, supports finding the inquiry merchandise to be circumventing the *Order*. In addition to the reasons explained by {Commerce} in its Draft Remand Results, the circumstances, timing, and quantities of inquiry merchandise imported to the United States also support {Commerce} in continuing to find that the inquiry

---

[85] This executive summary exceeds 450 words because we have addressed more than one "issue" in this comment.
[86] *See* 19 C.F.R. § 351.225(i)(1).
[87] *See* Draft Remand at 3.
[88] *See* Green Garden's Comments at 10-13.
[89] *See* Petitioners' Letter, "Petitioners' Rebuttal to Green Garden's Comments on Preliminary Affirmative Determination of Circumvention," dated December 19, 2023 at 9-13 (Petitioners' Preliminary Determination Rebuttal Comments).
[90] *See* Green Garden's Comments at 8.
[91] *See* 19 U.S.C. § 1677j(c)(1); *see also* Petitioner's Preliminary Determination Rebuttal Comments at 8-9; and Green Garden's Comments at Exhibit 1.

> merchandise circumvented the *Order*.[92] Specifically, "Green Garden requested that its suppliers produce further reduced garlic chunks" only after being informed by U.S. Customs and Border Protection {(CBP)} that the agency "considered the large garlic chunks to be within the scope of the Antidumping Duty Order on Fresh Garlic from the People's Republic of China."[93] Further, Green Garden and the mandatory respondents began either producing, selling, or importing the inquiry merchandise only after the issuance of the Order, and the quantity of inquiry merchandise entered is significant.[94]

**Commerce's Position:** Commerce continues to find that entries of small and large garlic chunks are circumventing the *Order* because small and large garlic chunks are "{an} article altered in form or appearance in minor respects," within the meaning of section 781(c) of the Act and 19 CFR 351.226(j).

*Whether Commerce Should Revise Its Findings on Preservation by Citric Acid*

As an initial matter, the petitioners agree with the results of Commerce's Draft Remand that the inquiry merchandise is not expressly excluded from the scope of the *Order* despite the addition of citric acid during processing.[95]

Green Garden claims that Commerce improperly considered whether the garlic chunks at issue are preserved "principally" by the addition of citric acid, and whether the garlic chunks are preserved by citric acid beyond the preservation resulting from the IQF process. Rather, Green Garden argues, Commerce should have only considered whether the garlic is preserved by the addition of citric acid, rather than create additional requirements.[96] As a result, in Green Garden's view, Commerce changes the determination from *whether* the garlic is preserved by citric acid to *what extent* the garlic is preserved by the addition of citric acid.[97] Green Garden

---

[92] *See* 19 C.F.R. § 351.226(j) (providing that Commerce "may consider the circumstances under which the products enter the United States, including but not limited to the timing of the entries and the quantity of merchandise entered during the circumvention review period").
[93] *See* Green Garden's Comments at Exhibit 1.
[94] *Id.*; *see also* Fenjun's QR at FN. 1, 12, and 32-35; and Hengxin's QR at FN. 1, 9-10, and 31.
[95] *See* Petitioners' Draft Remand Comments at 3.
[96] *See* Green Garden's Draft Remand Comments at 5-6.
[97] *Id.*

mischaracterizes Commerce's analysis. The Court directed Commerce to, "entertain the theory… that the order expressly excludes the importer's garlic chunks because they are preserved with citric acid."[98] Commerce finds that the addition of citric acid does not preserve the garlic because it is the IQF process that preserves the garlic and blanching the garlic in a citric acid aqua solution is simply a step in the IQF process.[99] In other words, the garlic is not being preserved by the addition of another ingredient (citric acid), but rather is being preserved through the IQF process, which is covered by the plain language of the scope of the *Order*.

Furthermore, Green Garden claims that Commerce incorrectly extends the Trinity IQF Garlic Cloves Scope ruling regarding heat processing to Green Garden's ruling regarding addition of other ingredients.[100] In addition, Green Garden claims that Commerce admits that citric acid preserves the garlic, but not before it is frozen.[101] However, Green Garden again mischaracterizes Commerce's analysis. As explained above, the salt in Trinity's blanching process acts the same as the citric acid in the inquiry merchandise's blanching process, in that it is not an additional ingredient that preserves the garlic.[102] Said differently, Commerce is not comparing the heat processing aspect in Trinity's blanching process but rather the effect the salt has in the IQF process and how it is similar to the citric acid in the IQF process of the inquiry merchandise, which, as in the Trinity IQF Garlic Cloves Scope Ruling, does not preserve the garlic by being added. Similarly, Commerce does not claim that citric acid could preserve the garlic if it was added before freezing; rather, Commerce is comparing the totality of the IQF process and determining that the addition of citric acid, alone, does not preserve the garlic. In

---

[98] *See Remand Order* at 18.
[99] *See* Draft Remand at 5.
[100] *See* Green Garden's Draft Remand Comments at 6-8.
[101] *Id.* at 8.
[102] *See* Draft Remand at 5.

fact, the Draft Remand explicitly states: "Record evidence thus supports finding that the minute addition of citric acid in the IQF process applied to the inquiry merchandise does not, on its own, constitute preservation by the addition of an ingredient."[103]

Green Garden also claims that Commerce's treatment of record information in determining that citric acid is not an additional ingredient that preserves the garlic was incorrect.[104] Specifically, Green Garden argues that Commerce's dismissal of Green Garden's FDA publication and scholarly article because citric acid may have other applications other than preservations was incorrect, because it shifts the inquiry from citric acid's effect to its intended purpose. However, as clearly stated in the Draft Remand, Commerce finds that there is no information in the FDA publication or scholarly article that supports Green Garden's claim that the inquiry merchandise is preserved using citric acid, nor any information that a citric acid aqua solution used for blanching is considered preservation using citric acid.[105] This determination does not reference producers' intended purpose of including citric acid, but emphasizes that there is no information on the record to support Green Garden's claim that the citric acid aqua solution preserves the garlic.

Green Garden claims that Commerce did not address record evidence that citric acid preserves garlic by inhibiting the growth of clostridium botulinum.[106] Green Garden cites a scholarly article stating that citric acid concentrations in the range of 0.19 to 0.96 percent inhibited growth of both clostridium botulinum vegetative bacteria and spore inocula.[107] However, Green Garden fails to mention that the inhibition of the growth of clostridium

---

[103] *Id*.
[104] *See* Green Garden's Draft Remand Comments at 8-12.
[105] *See* Draft Remand at 6.
[106] *See* Green Garden's Draft Remand Comments at 10.
[107] *Id*. at Exhibit 1.

botulinum and spore inocula comes from the citric acid concentration *and* a pH level of 5.2.[108] In other words, even though the citric acid concentration affects the pH level, it is the pH level that is the driving factor of inhibiting bacterial growth, not the citric acid concentration percentage. More importantly, there is no record information stating the pH level of the citric acid aqua solution used for inquiry merchandise and, as a result, Commerce cannot confirm that the pH level rises to the level of inhibiting bacterial growth. Furthermore, this inhibitory effect occurred under specialized laboratory conditions that are not similar to the inquiry merchandise's blanching process. Specifically, the citric acid solution was added and never removed during the process, which lasted from two to fourteen days,[109] and therefore differs from the inquiry merchandise's process in which the merchandise was submerged in the citric acid aqua solution for a total time of six minutes and thirty seconds.[110]

Finally, Green Garden states that Commerce failed to address Green Garden's evidence concerning Chinese producers generally.[111] However, in the Draft Remand, Commerce specifically addressed Green Garden's arguments.[112] Commerce noted that as it determined that the inquiry merchandise is not expressly excluded from the scope of the *Order*, it need not determine whether any other producers of inquiry merchandise are excluded from the scope of the *Order*. However, to comply with the Court's Remand Order, Commerce weighed the evidence and analyzed Green Garden's argument.[113] Specifically, Commerce finds that as the record does not contain evidence of whether Green Garden's suppliers also supply to other U.S. importers, Commerce is unable to discern from the record whether Green Garden's arguments

[108] *Id*.
[109] *Id*.
[110] *See* Green Garden's Comments at 9.
[111] *Id*. at 12.
[112] *See* Draft Remand at 8-9.
[113] *See Remand Order* at 18.

are applicable to all producers/exporters of inquiry merchandise from China.[114] In addition, the fact that all of Green Garden's arguments were framed as asserting that "Green Garden's inquiry garlic"[115] should be excluded from the scope of the *Order* is further evidence that Commerce cannot affirmatively take Green Garden's arguments as representative of inquiry garlic beyond what Green Garden imports.[116] Therefore, Commerce has considered Green Garden's argument regarding general producers, and found that it is not supported by evidence on the record. As a result, Commerce finds that evidence does not show that producers of inquiry merchandise besides Green Garden use citric acid as a preservative.

*Whether Commerce Should Revise Its Circumvention Inquiry Analysis*

The petitioners agree with the results of Commerce's Draft Remand regarding the circumvention inquiry analysis with respect to expectations of the ultimate users and the use of the merchandise, channels of marketing and distribution, and cost of modifying the merchandise relative to its total value.[117]

Commerce disagrees with Green Garden's claim that Commerce's reconsideration of the circumvention inquiry analysis regarding expectations of the ultimate users and use of the merchandise and channels of distribution do not cure deficiencies identified by the Court. Specifically, Green Garden states that, at most, there is some overlap between inquiry merchandise and in-scope garlic.[118] The Court held that Commerce did not consider certain supporting documentation presented by Green Garden relating to the expectations of ultimate

---

[114] *Id*. at 9.
[115] *See, e.g.*, Green Garden's Comments at 5 ("Green Garden's Small Garlic Chunks are described as…") and 9 ("Green Garden's use of citric aqua solution to blanch the garlic chunks should not remove the garlic chunks from the scope of the *Order*.").
[116] *See* Draft Remand at 9.
[117] *See* Petitioners' Draft Remand Comments at 8-10.
[118] *See* Green Garden's Draft Remand Comments at 3 and 12-15.

users and use of merchandise.[119] In the Draft Remand, Commerce expressly addressed Green Garden's arguments regarding expectations of the ultimate users and use of the merchandise and channels of distribution.[120]

Commerce also disagrees with Green Garden's claim that Commerce unreasonably changed its assessment of the cost evidence provided by the respondents.[121] Commerce continues to find that the documentation supporting Green Garden's claim that dicing provides significant added value is unreliable; regardless, even if Commerce were to accept that claim at face value, the cost of modification is insignificant in this case.[122]

*I. Expectations of Ultimate Users and Use of Merchandise*

Green Garden claims that the fact that some food processors purchase both inquiry merchandise and in-scope garlic for further processing demonstrates an overlapping use, not identical expectations or uses.[123] In addition, Green Garden argues that as only 15-20 percent of fresh garlic was sold or used for further processing, it is not representative of the remaining 80-85 percent of users who value the size, shape, color, and aesthetic appearance of fresh garlic.[124] However, Green Garden mischaracterizes the purpose of that information and selectively ignores the other support provided. As an initial matter, Commerce never stated that the expectations and uses of fresh garlic used for further processing are applicable to the remaining 80-85 percent of users. The purpose of stating that 15-20 percent of fresh garlic is destined for further processing is to emphasize that there is interchangeability between inquiry merchandise and in-scope garlic and, as a result, both products involve the same expectations of ultimate users and

---

[119] *See Remand Order* at 20-22.
[120] *See* Draft Remand at 9-13.
[121] *See* Green Garden's Draft Remand Comments at 17.
[122] *Id*. at 15-16.
[123] *Id*. at 13.
[124] *Id*.

uses. Furthermore, the ITC report compares dehydrated garlic to fresh garlic and concludes that the differences between the two products are insufficient to render them separate domestic like products.[125] Although dehydrated garlic is not the inquiry merchandise, the ITC determined that the amounts of each product sold for further processing are not sufficient to determine that the two products are separate like products, which is instructive to Commerce's analysis in this circumvention inquiry and remand.[126] Moreover, Green Garden claims that Commerce did not address the contrary evidence from the ITC report showing that in some applications, whether a garlic clove is cut up matters for appearance and other reasons.[127] In other words, for fresh-market applications, purchasers care about the size, shape, color, and appearance.[128] However, Commerce explicitly addressed this in the Draft Remand by referencing the ITC report.[129] Specifically, Commerce notes that the ITC report states that fresh garlic may also be used in chopped or pureed form and most importantly, chopped garlic is often displayed alongside fresh garlic as an alternative to using unprocessed fresh garlic bulbs to help reduce food preparation time.[130] Consequently, the ITC considers chopped garlic, which includes inquiry merchandise, as in-scope fresh garlic and aesthetically pleasing. Accordingly, Commerce finds Green Garden's arguments unpersuasive and continues to conclude that the ultimate users' expectations and merchandise use for the inquiry merchandise are the same as for in-scope fresh garlic. This supports a finding that the inquiry merchandise is minorly altered within the meaning of section 781(c) of the Act and 19 CFR 351.226(j).

---

[125] *See* ITC Final Staff Report at I-40 to I-41.
[126] *Id.*
[127] *See* Green Garden's Draft Remand Comments at 13.
[128] *Id.*
[129] *See* Draft Remand at 10 (citing ITC Final Staff Report at II-7).
[130] *Id.*

*II. Channels of Marketing and Distribution*

Green Garden claims that Commerce improperly equates the limited overlap of channels of distribution with a finding that the channels of distribution are the same.[131] Specifically, Green Garden states that one channel of distribution of fresh garlic to food processors does not demonstrate that the distribution channels between fresh garlic and the inquiry merchandise are identical.[132] Green Garden again mischaracterizes Commerce's analysis. Green Garden is correct that one of the channels of distribution of fresh garlic is to food processors; however, Commerce considers this channel in the context of all fresh garlic channels of distribution.[133] In other words, Commerce finds that the channels of distribution between fresh garlic and the inquiry merchandise are identical except for the end user or customer that the garlic is being sold to.[134] Green Garden claims that Commerce limited its comparison of channels of distribution by stating in its conclusion that the channels of distribution for the inquiry merchandise are the same as in-scope fresh garlic (sold to processors).[135] This phrasing does not show that Commerce limited its comparison because, as discussed above, the channel of distribution to processors is not a separate channel from fresh garlic but rather a channel under the umbrella of all fresh garlic channels of distribution. Furthermore, Green Garden claims that Commerce's reliance on marketing materials at most shows another form of overlap.[136] However, these marketing materials in fact support the conclusion that the channels of distribution are identical. Specifically, the marketing materials demonstrate that IQF garlic cloves, fresh garlic cloves, and inquiry merchandise are all marketed identically.[137] In addition, certain marketing materials

---

[131] *See* Green Garden's Draft Remand Comments at 14.
[132] *Id*.
[133] *See* ITC Final Staff Report at II-19.
[134] *See* Draft Remand at 13.
[135] *See* Green Garden's Draft Remand Comments at 14.
[136] *Id*. at 15.
[137] *See* Draft Remand at 12 (citing Petitioners' Circumvention Request at Exhibit 10).

indicate that IQF garlic as both whole cloves and chunks can be used as a substitute for fresh garlic.[138] Therefore, the marketing materials support the determination that the channels of distribution are identical due to the fact that they fall under the umbrella of fresh garlic distribution channels as a whole and only differ when it comes to the customer. Accordingly, Commerce continues to find that the channels of marketing and distribution for the inquiry merchandise are the same as in-scope fresh garlic and support a finding that the inquiry merchandise is minorly altered.

*III. Cost of Modification Relative to Total Value*

Green Garden claims that Commerce changed its assessment of the respondents' cost evidence without acknowledging that it has changed its position or adequately explaining why evidence it previously relied upon is now unreliable.[139] Specifically, Green Garden states that in the original circumvention determination, Commerce relied upon the respondents' questionnaire responses when analyzing the cost of modification and did not reject those responses as incomplete, unsupported, or unreliable.[140] However, the Court remanded for reconsideration this factor from Commerce's minor alteration analysis.[141] As a result of Commerce's reconsideration of this factor, Commerce was able to confirm the price that Fenjun used to support its claim and what Commerce used as support in Commerce's original determination; however, during the review, Commerce identified gaps of information (*i.e.*, [ ]) that detracted from Fenjun's claim and as a result, cannot be relied upon.

---

[138] *Id.*
[139] *See* Green Garden's Draft Remand Comments at 17.
[140] *Id.*
[141] *See Remand Order* at 24.

Green Garden argues that Commerce did not analyze the cost of modifications relative to total value.[142] However, as explained above, Commerce found that there was insufficient evidence on the record for Commerce to consider this argument. Further, even accepting the respondents' reporting at face value, Commerce does not consider the relative value of 13 to 21.3 percent to be substantial.[143] Similarly, Green Garden argues that Commerce fails to explain the reasoning for finding the cost of modification insignificant in light of "historical" treatment.[144] Again, even if Commerce were to accept the reporting of the value added, Commerce made clear in its Draft Remand that the value added in this case is similar to the value added in prior findings of circumvention.[145] Green Garden provides no reason for why its historical example of *Vanadium from Russia* from 2012 should outweigh Commerce's historical example of *Solar Cells from China* in 2023, which was affirmed in court.

In addition, Commerce disagrees with Green Garden's claim that Commerce's deficiency allegation comes without the notice and opportunity to cure the deficiency. The respondents' unreliable supporting documentation is not a deficiency, but rather a failure to meet the burden for providing the requisite evidence to support its claim. Regardless, as stated in the Draft Remand, the initial questionnaire requested fully translated documentation supporting the response (*i.e.*, internal price lists), which neither respondent provided.[146] In a supplemental questionnaire, Commerce asked the respondents to provide all available documentation related to the difference in cost incurred in producing the subject and inquiry merchandise.[147] The

[142] *See* Green Garden Comments at 15-16.
[143] *See* Draft Remand at 15-16; *see also Canadian Solar International Limited v. United States*, 788 F. Supp. 3d 1262, 1274 (CIT 2025) (upholding Commerce's finding that a value added within the range of 26 to 34 percent of U.S. import value was a small proportion of the total value).
[144] *See* Green Garden Comments at 16-17.
[145] *See* Draft Remand at 15-16.
[146] *See* Commerce's Letter, "Circumvention Inquiry Initial Questionnaire," dated July 19, 2023, at 5.
[147] *See* Fenjun's SQR at 2.

respondents' responses to this supplemental questionnaire failed to provide the requested support, and constituted a failure to meet the burden for providing the requisite evidence despite two opportunities.

Furthermore, Commerce relied on record evidence of the purchase orders that contain all the requisite information that allows Commerce to properly conduct the analysis, and which directly contradict Green Garden's statements.[148] Specifically, [ ].[149] Accordingly, Commerce continues to find that the dicing provides insignificant added value to the merchandise and that this supports a finding that the inquiry merchandise is minorly altered.

*Whether Circumstances Under Which the Inquiry Merchandise Enters the United States Supports a Finding of Circumvention*

Commerce agrees with the petitioners that the circumstances and timing of the inquiry merchandise imported to the United States support a finding that the inquiry merchandise is minorly altered.[150] As an initial matter, 19 CFR 351.226(j) states that Commerce "may consider the circumstances under which the products enter the United States, including but not limited to the timing of the entries and the quantity of merchandise entered during the circumvention review period."[151]

In Green Garden's scope ruling application, it stated that it first started importing its garlic under HTSUS subheading 2004.90.8580, which is also the same HTSUS subheading Trinity's IQF garlic cloves were imported under and found covered by the plain language of the

[148] *See* Draft Remand at 15.
[149] *Id*.
[150] *See* Petitioners' Draft Remand Comments at 7 (citing Green Garden's Comments at Exhibit 1 (Green Garden's Scope Application at 8-9)).
[151] *See* 19 CFR 351.226(j).

scope of the *Order*.[152] Green Garden argued to CBP that the entries of the inquiry merchandise were not covered by the scope of the *Order* because they were preserved in citric acid.[153] However, CBP determined that the inquiry merchandise was within the scope of *Order* because "the blanching and citric acid treatment did not exclude the garlic from the scope of A-570-831 and that the trimming of the garlic was not significant enough to be considered reduced in size," and that a scope ruling request would be needed for CBP to treat them otherwise.[154] Green Garden later states that the producers previously produced large garlic chunks imported by Green Garden but CBP considered the large chunks to be within the scope of the *Order*.[155] Accordingly, "{f}ollowing CBP's notice, Green Garden requested that its suppliers produce further reduced garlic chunks. Green Garden now imports the small garlic chunks."[156] Therefore, it is clear that only after the CBP determination did Green Garden seek to alter the products in minor respects to remove them from the scope of the *Order*.

## V. FINAL RESULTS OF REDETERMINATION

Upon reconsideration of the record and in accordance with the Court's *Remand Order*, Commerce continues to find that entries of small and large garlic chunks are circumventing the

[152] *See* Petitioners' Draft Remand Comments at 7 (citing Green Garden's Comments at Exhibit 1 (Green Garden's Scope Application at 17)).
[153] *See* Green Garden's Comments at Exhibit 1 (Green Garden's Scope Application at 17).
[154] *Id*. (citing Exhibit 14).
[155] *See* Petitioners' Draft Remand Comments at 7 (citing Green Garden's Comments at Exhibit 1 (Green Garden's Scope Application at 8-9)).
[156] *Id*.

*Order* because small and large garlic chunks are "{an} article altered in form or appearance in minor respects," within the meaning of section 781(c) of the Act and 19 CFR 351.226(j).

9/14/2026

X Christian L. Bush

Signed by: International Trade Administration

Christian L. Bush
Acting Deputy Assistant Secretary
for Policy and Negotiations